UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MELVIN CHANCY,

        Petitioner,

                                                     CASE NO. 05-CV-74084-DT

v.                                   CHIEF JUDGE BERNARD A. FRIEDMAN
                                       MAGISTRATE JUDGE PAUL J. KOMIVES

KENNETH T. McKEE,

        Respondent.

_____/


**REPORT AND RECOMMENDATION**


*Table of Contents*

I.       RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.     REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
       A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
       B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
       C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
       D.    *Sufficiency of the Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
            2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
       E.    *Sentencing (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
       F.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

\*       \*       \*       \*       \*


I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.    *Procedural History*

       1.      Petitioner Melvin Chancy is a state prisoner, currently confined at the Bellamy Creek Correctional Facility in Ionia, Michigan.

       2.      On June 2, 2003, petitioner was convicted of one count of second degree murder,

MICH. COMP. LAWS § 750.317, following a jury trial in the Wayne County Circuit Court.  On June 16, 2003, he was sentenced to a term of 25-50 years' imprisonment.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      INSUFFICIENT EVIDENCE WAS PRESENTED TO PROVE BEYOND A REASONABLE DOUBT THAT THE VICTIM'S DEATH WAS CAUSED BY ANY ACTION OF MR. CHANCY.

II.     THE TRIAL COURT ERRONEOUSLY SCORED 15 POINTS FOR OV-5 (SERIOUS PSYCHOLOGICAL INJURY TO MEMBER OF VICTIM'S FAMILY) AND 50 POINTS FOR OV-7 (EXCESSIVE BRUTALITY) RESULTING IN A B-III LEVEL WITH A SENTENCING GUIDELINES RANGE OF 180 TO 300 MONTHS, OR LIFE; ABSENT THE ERRONEOUSLY INCLUDED POINTS THERE WOULD BE AND SHOULD BE A B-I LEVEL WITH A SENTENCING GUIDELINES RANGE OF 144 TO 240 MONTHS; THE TWENTY-FIVE YEAR (300 MONTHS) MINIMUM TERM WAS UNSUPPORTED AND A RE-SENTENCING IS REQUIRED.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Chancy*, No. 249893, 2004 WL 2881008 (Mich. Ct. App. Dec. 14, 2004) (per curiam).

4.      Petitioner, proceeding *pro se*, sought leave to appeal these two issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Chancy*, 473 Mich. 883, 699 N.W.2d 700 (2005).

5.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on October 25, 2005.  As grounds for the writ of habeas corpus, he raises the two claims that he raised in the state courts.

6.      Respondent filed his answer on May 1, 2006.  He contends that petitioner's insufficient evidence claim is without merit, and that petitioner's sentencing claim is not cognizable on habeas review.

2

B.      *Factual Background Underlying Petitioner's Conviction*

The factual background leading to petitioner's conviction was accurately summarized in petitioner's brief in the Michigan Court of Appeals:

> The case arose from the death of 47 year-old Myron Washington; Mr. Washington was 5' 9", was of slim build, and at the postmortem weighed 158 pounds (TT, 5/28/03, at 173; testimony of Dr. Leigh Hlavaty, Assistant Medical Examiner). His cause of death was blunt force trauma to the head, which caused two hairline fractures to the right-side of Mr. Washington's skull, with related subdural bleeding and swelling, and his left cheek was swollen and bruised (TT, 5/28/03, at 164; 166). Dr. Hlavaty found evidence of two impacts to Mr. Washington's head, but said that there could have been more (TT, 5/28/03, at 164). Dr. Hlavaty testified that Mr. Washington['s] brain injuries were fresh, and that new injuries to the brain will appear as fresh injuries within 24 hours of death; also, Mr. Washington had been in the hospital for 24 hours before he expired (TT, 5/28/03, at 170-71).[1]
>
> Mr. Washington was found lying in an alley at 8:05 AM on September 14, 2002, in the area of Elmhurst and Wildemere streets (TT, 5/28/03, at 84-85; testimony of Police Officer Howard Sweeney). Mr. Washington was taken to the hospital that morning, and expired the next day, on September 15, 2002 (TT, 5/28/03, at 90; testimony of Valerie Buckley, Mr. Washington's sister). Ms. Buckley said that Mr. Washington had lived with Mr. Chancy's grandmother in a house on Sturtevant Street (TT, at 93). She described Mr. Washington as being in generally good health, but said

---

[1]More specifically, Dr. Hlavaty testified:

> There were two hairline fractures that extended from the right temple and then tracked through to the base of the skull. There was extensive bleeding underneath the connective tissue that covered the right path of his brain, and that bleeding is what we call subdural bleeding. And then there are also patch hemorrhages that are called subarachnoid hemorrhages on the under surface of the right half of his brain overlying where the previously mentioned fractures were located.
>
> And then secondary to all of these injuries, the brain was severely swollen and herniated with evidence of hemorrhage within the brain stem.

Trial Tr., Vol. II, at 166. Dr. Hlavaty also testified that the blows sustained by the victim would not have immediately incapacitated him:

> In this particular event, he would not have been rendered unconscious immediately. He would have been rendered unconscious at a point which that subdural bleeding had accumulated to the point where it finally impinged on vital brain centers, and that for most individuals would usually take up to one to two hours. So during that time period, although he may have had a headache, he would have been able to walk and talk.

*Id*. at 170.

3

that he had an injured arm (TT, at 97).

Two scenes were examined by police evidence technicians; one was in the alley where Mr. Washington was found, and the other was on Sturtevant Street – where the beating was alleged to have occurred – a distance of six blocks from the alley (TT, 5/28/03, at 113; 121; testimony of Detroit Police Evidence Technician Rick Fields). In the alley Officer Fields found an empty whiskey bottle about two feet from an arm-sling (TT, at 122-123).

Thirteen year-old Ahrealure Holloway testified that in the evening of September 13, 2002 she was visiting her friend Arquatta Long, on Ms. Long's porch at her house on Sturtevant Street (TT, 5/28/03, at 7-8). Miss Holloway knew Mr. Washington from the neighborhood, and saw him walking down the street that evening, as it was just getting dark; two people, one a youth whom she knew as "JR", and another, whom she identified as Mr. Chancy, approached Mr. Washington and started slapping him, or beating him up (TT, at 10-12; 28; 29-30). Miss Holloway said she heard JR first tell the other person that "There's that nigger right there that stabbed me in the head," and the two then approached Mr. Washington and JR punched Mr. Washington in the face; Mr. Washington swung back, but missed, and fell to the ground; the two males then stomped and kicked Mr. Washington, who balled-up on the ground, with a "couple of kicks" (TT, at 33; 36; 37). After the incident, which occurred about four houses down from where Miss Holloway was seated, Mr. Washington acted like he was all right, "got up like nothing happened to him," and continued walking towards Linwood Street (TT, at 38).[2]

Twenty year-old DaJuane Lee testified he was on the porch of his friend's grandmother's house, and he saw Mr. Washington walk by; Mr. Lee knew Mr. Washington, and would see him every day on the street (TT, 5/28/03, at 51-52). Mr. Washington walked about three houses down from where Mr. Lee was seated, and Mr. Lee saw two guys run up behind Mr. Washington; one of the guys was Mr. Chancy, whom Mr. Lee knew as "Dion" (TT, at 53-54; 64). Mr. Lee said Mr. Chancy hit Mr. Washington, then the second person started hitting Mr. Washington, and Mr. Washington fell to the ground; the second person then kicked Mr. Washington real hard, then both kicked Mr. Washington, who curled-up in a fetal position on the ground (TT, at 58-61). Mr. Lee said the beating lasted just a "few second" ("It wasn't no minutes or not that long") (TT, at 78), and the two males then walked away; as they were leaving Mr. Lee heard Mr. Chancy yell to Mr. Washington "bring my grandma's shit back before you get your ass kicked again" (TT, at 62). Mr. Washington got up

---

[2]On cross-examination, Holloway testified that she thought petitioner had struck the first blow, and that both JR and petitioner were "kicking anywhere; they was stomping and kicking." Trial Tr., Vol. II, at 36. She also testified that petitioner did not appear to be limping or favoring one of his legs. *See id*. at 43. She testified specifically that petitioner kicked the victim in the head, although they may have been deflected by the victim's arms and hands. *See id*. at 36-37.

and continued walking towards the store on Linwood (TT, at 63).[³]

     Arquatta Long testified she was visiting her grandmother on Sturtevant Street on September 13, 2002, and saw Mr. Washington walk by the house at about 8:00-8:30 PM (TT, 5/28/03, at 131-132). She saw two guys, who were walking in the street, stop in front of her grandmother's house and one, whom she identified as Mr. Chancy, said "There goes that motherfucker" (TT, at 133; 134-135). She saw the two approach Mr. Washington, who was then about 3-4 houses away from Ms. Long, and Ms. Long heard the young guy say something to Mr. Washington, and then saw him hit Mr. Washington, who fell to the ground (TT, at 135, 143-144). She saw both of the guys then kick Mr. Washington in the areas of his back, stomach and head (TT, at 136, 154). M[s]. Long said she saw Mr. Chancy and the other kick Mr. Washington six or seven times (TT, at 138; 154). The two guys then walked away from Mr. Washington and stopped again in front of Ms. Long's grandmother's house, from where M[s]. Long heard Mr. Chancy tell Mr. Washington that he had "better get to the store and get my grandmother's shit before I beat your ass again" (TT, at 139). Mr. Washington got up and staggered away towards Linwood Street (TT, at 140). Ms. Long said that the punching and kicking "happened so fast" that she could not put a time on its duration (TT, at 150).[⁴]

     Mr. Chancy testified at the trial. He was 27 years-old, and had been living in California; he came to Michigan in September, 2002 to visit family; his grandmother, Joann Nagley, lived on Sturtevant Street; Mr. Washington lived with Ms. Nagley, and Mr. Chancy had known Mr. Washington for about eight years; there had never been any arguments or fights between Mr. Chancy and Mr. Washington during that time (TT, 5/29/2003, at 13-14).

     On September 13, 2002 Mr. Chancy went outside with JR at about 7:30 PM; it was just getting dark (TT, at 16). Mr. Chancy saw Mr. Washington walking towards Linwood, and Mr. Chancy then told JR that "there goes Myron, my stepgrandfather," and that he might be going to the store for Mr. Chancy's grandmother (TT, at 18). J[R] then said that he wanted to get him, and had been waiting to get him for the longest; JR then ran up the middle of the street to Mr. Washington and punched him, then kicked him about five times; Mr. Washington had fallen to the ground (TT, at 18). Mr. Washington told JR to "quit playing with [him], [he was] a grown man" (TT, at 18). JR then stopped and Mr. Washington got up with no apparent trouble, and continued walking towards Linwood (TT, at 18). Mr. Chancy testified that at the time JR struck Mr. Washington Mr. Chancy was about four houses away (TT, at 19-20; 23),

---

   ³Lee specifically testified that petitioner kicked and stomped the victim on the head and back, and that although the victim was trying to cover his head with his arms, he could not do so because one arm was in a sling. *See* Trial Tr., Vol. II, at 60.

   ⁴In addition, Long testified that petitioner kicked the victim first, and that he appeared to be the leader and to have kicked the victim more than JR. *See* Trial Tr., Vol. II, at 136, 140. She also testified that petitioner and JR kicked the victim in the head, back, and stomach. *See id.* at 137, 138-39.

5

and that he had taken no part in the punching or kicking (TT, at 43). Mr. Chancy said that about four days earlier he had injured his leg, and that although he walked that day without the crutches given him, he could not run (TT, at 30; 36).

Def.'s Br. on Appeal, in *People v. Chancy*, No. 249893 (Mich. Ct. App.), at 1-6.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to

6

'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v.*

7

*Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Sufficiency of the Evidence (Claim I)*

Petitioner first claims that the prosecution presented insufficient evidence that he killed the victim to sustain his conviction. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

8

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999). Accordingly, it is necessary to examine the elements of second degree murder under Michigan law.

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317. To establish second degree murder, the prosecution must show that the defendant killed a human being with malice aforethought. In order to show malice aforethought, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980).

2.    *Analysis*

Petitioner does not challenge the sufficiency of the evidence with respect to malice aforethought. Nor does he challenge the sufficiency of the evidence with respect to his assault of the victim. Rather, petitioner contends that there was insufficient evidence that the victim's death resulted from the assault, *i.e.*, that petitioner caused the victim's death. The Michigan Court of Appeals rejected this claim, reasoning:

9

The evidence showed that defendant and his cousin attacked the victim, punched him and knocked him to the ground, and then kicked and stomped on him. The beating resulted in two hairline skull fractures and massive brain trauma. The assistant medical examiner who performed the autopsy testified that although the victim was able to leave the scene on his own, the injuries would have rendered him unconscious within one to two hours. He was discovered in an alley the next morning and hospitalized but died the following day. The forensic pathologist testified that the injuries were recent, apparently meaning that they were incurred approximately within twenty-four hours of death not including life-sustaining efforts. Given that defendant kicked the victim in the head and the victim died from blunt-force trauma to the head, the evidence was sufficient to permit a rational trier of fact to conclude beyond a reasonable doubt that the death was caused by the beating defendant inflicted.

*Chancy*, 2004 WL 2881008, at *1, slip op. at 2. The Court should conclude that this determination was reasonable.

Petitioner contends that there was "no evidence of what befell Mr. Washington" between the time of the assault and the time he was discovered in the alley, six blocks away, 12 hours after the assault. Br. in Supp. of Pet., at 8. Noting the medical examiner's testimony that the injuries occurred within 24 hours of the victim's death and the evidence that a liquor bottle, some change, and some broken glass were found in the alley where the victim was discovered, petitioner argues that "[t]he most reasonable interpretation of the factual evidence is that Mr. Washington was assaulted in the alley early the next morning by unknown perpetrators, and sometime after he visited the store and purchased the liquor. There is, simply, no evidence to establish beyond a reasonable doubt that the short flurry of kicks by JR and Mr. Chancy (in the light most favorable to the prosecution) caused the fatal injuries." *Id*. The Court should disagree.

First, petitioner's reliance on the length of the assault as casting doubt on the extent of the injuries caused by him and JR is misplaced. It is true that the witnesses testified that the assault did not last a long time. It is also true, however, that each witness testified that petitioner and JR repeatedly stomped and kicked the victim about the head during the assault. A rational jury could

10

conclude that, despite the brevity of the assault, the blows delivered by petitioner and his accomplice were sufficiently severe to have caused the fatal head wounds suffered by the victim. *Cf. United States v. Agofsky*, 458 F.3d 369, 375 (5th Cir. 2006) (evidence supported capital sentencing factor of especially heinous or cruel murder where evidence showed that defendant repeatedly stomped the victim's head and neck, despite brevity of the attack).

Second, petitioner's speculation as to what might have befallen the victim in the interval between the assault and the discovery of the victim 12 hours later does not negate the sufficiency of the evidence that petitioner caused the victim's death. It is well established that the prosecution's evidence "need not remove every reasonable hypothesis except that of guilt.'" *United States v. Jenkins*, 345 F.3d 928, 940 (6th Cir. 2003) (quoting *United States v. Stines*, 313 F.3d 912, 919 (6th Cir. 2002) (internal quotation omitted)); *accord Jackson*, 443 U.S. at 326; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). It is true that the medical examiner testified that "fresh" brain injuries begin to heal within 24 hours, and that the victim's injuries appeared to be fresh. However, the medical examiner did not state that this was always the case, only that it "usually" is so. *See* Trial Tr., Vol. II, at 171. In short, petitioner offers nothing but speculation that something else might have happened to the victim between the time of the assault and the time he was discovered twelve hours later. In light of the evidence concerning the nature of the assault and the medical testimony regarding the cause of death, however, this speculation would not have prevented a rational jury from concluding beyond a reasonable doubt that petitioner caused the victim's death.

Several state cases support the conclusion that the evidence of causation was sufficient. For example, in *Commonwealth v. Chester*, 188 A.2d 323 (Pa. 1963), the victim was discovered dead over 12 hours after being assaulted by the defendant. In the interval he had seen a doctor and talked to several people. Notwithstanding the lapse of time between the assault and the death, the court

11

concluded that the evidence was sufficient to sustain the defendant's conviction for murder. The court explained that the medical examiner testified that the victim's death was due to shock caused by the assault, and that the shock may have masked the victim's symptoms and may be delayed. *See id.* at 327. The court also rejected the defendant's speculation that someone else may have caused the death in the interval between the assault and the death, explaining: "Of course, it is *possible*–although highly improbable–that between 3:00 a.m. and 10:00 a.m. someone else entered Walker's room and beat him. However, the Commonwealth is not required to prove its case with absolute certainty but only beyond a reasonable doubt." *Id.* at 327-28. In *Commonwealth v. Dougherty*, 178 N.E.2d 584 (Mass. 1961), the victim died about 24 hours after the assault which caused his death. In light of the medical testimony that the victim died from blunt force injuries, the court concluded that the prosecution adequately established causation, explaining that "[t]he inference was open that beatings by the defendants had caused the death even if it ensued some time later." *Id.* at 588. Similarly, in *People v. Singleton*, 486 N.Y.S.2d 78 (N.Y. Sup. Ct., App. Div. 1985), the court found the evidence sufficient to establish causation where the victim died from a subdural hematoma eight days after the assault and there was "no evidence of any intervening event which could have caused the subdural hematoma." *Id.* at 79.

In light of this caselaw and the evidence presented at trial, it cannot be said that the Michigan Court of Appeals's conclusion that the evidence was sufficient to prove that petitioner caused the victim's death was an unreasonable application of *Jackson v. Virginia*. And because the Michigan Court of Appeals did not unreasonably apply *Jackson*, petitioner is not entitled to habeas relief on this claim. *See* 28 U.S.C. § 2254(d)(1).

E.     *Sentencing (Claim II)*

In his second claim, petitioner contends that the trial court erred in scoring two offense

12

variables under the Michigan sentencing guidelines. This claim is not cognizable on habeas review, and thus does not entitle petitioner to habeas relief.

As a general matter, a habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987). Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Petitioner's claim that the court improperly scored the guidelines range raises an issue of state law not cognizable on habeas review. *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also*, *Branan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C.

§ 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 12/8/06

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on December 8, 2006.

s/Eddrey Butts
Case Manager

14